| | |
|---|---|
| LARRY MICHAEL BOLLINGER,       ) | |
| ) | |
| Petitioner,     ) | |
| ) | |
| vs.     ) | ORDER |
| ) | |
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| Respondent.    ) | |
| _____) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255. [CV Doc. 1].[1] Also pending is the Government's Motion to Dismiss and Response, [CV Doc. 10], Petitioner's Pro se Status Report and Motion for Extension of Time to File Response/Reply, [CV Doc. 11], Petitioner's Request for Permission to Amend or Supplement Previously Submitted Pleading, [CV Doc. 14], Petitioner's Motion to Supplement Pleadings, [CV Doc. 15], and Petitioner's Pro se Request of Amend Pending 2255 Motion, [CV Doc. 21].

## I.    BACKGROUND

### A.    Petitioner's Underlying Criminal Conduct.

In 2004, Petitioner Larry Michael Bollinger, an ordained Lutheran minister, traveled from his home in Gastonia, North Carolina, to Port Au Prince, Haiti, to direct the Lazarus Project, a

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the letters "CV," denoting that the document is listed on the docket in the civil case file number 3:17-cv-00271-RJC, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number 3:12-cr-00173-RJC-1.

ministry that includes a school that serves hundreds of children outside of Port Au Prince, known as the Village of Hope, as well as a gated compound, called Hope House, that includes residences and housing for missionary teams. [CR Doc. 52 at 11, 14-15, 21-22, 37: Tr. Sentencing Hearing; CR Doc. 39-1 at 8-9: Sealed Sentencing Memorandum, Ex. 1]. Between 2004 and the summer of 2009, Petitioner and his wife, Margaret Bollinger, spent most of the year in Haiti but maintained their home in Gastonia, coming home periodically when their work permitted or for board meetings or promotional speeches. [Doc. 52 at 86-87].

For nearly all of his time as an ordained minister, Petitioner, who was married, frequented adult bookstores and ultimately began paying for sex with prostitutes, a pattern of behavior that continued as he moved from one congregation to the next, staying at each for between five and ten years. [CR Doc. 52 at 10, 12; Doc. 39-7 at 7, 15]. About a year-and-a-half after taking over responsibility for the Village of Hope, Petitioner began picking up prostitutes in Haiti, doing so regularly between 2006 and 2009. [Doc. 52 at 14-15, 17; Doc. 39-7 at 15].

In 2009, Petitioner moved from frequenting adult prostitutes to molesting young girls. From early in Petitioner's tenure with the Village of Hope, girls knocked on the gate of the compound, asking to be fed before school. [CR Doc. 52 at 18-19]. In the Spring of 2009, Petitioner began having sexual contact with a 16- or 17-year-old girl, which continued until he "caught her trying to steal a substantial amount of money from the ministry and kicked her out." [CR Doc. 52 at 18; CR Doc. 39-1 at 3]. According to Petitioner, he touched the first victim sexually and she masturbated him but refused to perform oral sex on him. [CR Doc. 39-1 at 3]. In August of 2009, as Petitioner later described it, "some girls came to the [Village of Hope] compound and made themselves available." [CR Doc. 52 at 17, 59; CR Doc. 39-7 at 7-8]. Each of those girls was 11-years old and, on four different occasions, Petitioner engaged in sexual activity with them,

performing oral sex on them, fondling them, rubbing his penis on their genitals until he ejaculated, and having them masturbate him, though not all of this sexual activity occurred on each occasion. [CR Doc. 52 at 17, 50-55; CR Doc. 39-1 at 4-7, 10-11; CR Doc. 39-6 at 3-5; CR Doc. 39-7 at 15]. According to Petitioner's report to National Center for Missing and Exploited Children (NCMEC), these girls "came onto him sexually," "begged [him] to perform oral sex on them," and "wanted to have intercourse with [Petitioner]," but he refused to have intercourse. [CR Doc. 52 at 51-52; CR Doc. 39-1 at 4; CR Doc. 39-6 at 4; see also CR Doc. 39-7 at 7; Doc. 43-7 at 3: Sealed Sentencing Memorandum, Ex. 7].

On September 27, 2009, while Petitioner was in bed with another woman, he received a telephone call from his wife, who was at their home in Gastonia. [CR Doc. 52 at 22, 89]. Petitioner's wife told Petitioner that she had had a restless night and wanted to know if he had been cheating on her. [Id.]. Petitioner confessed that he had, explaining to her that "he had been picking women up on the street and that he just couldn't stop," and agreed to counseling. [Id. at 22-23, 90]. About a week later, Petitioner traveled to Virginia to meet with the chair of the Lutheran organization that administered the Village of Hope, confessing that he had an addiction to sex but omitting any mention of his molestation of young girls. [Id. at 23-24].

Petitioner then went to North Carolina, and he and Ms. Bollinger had a telephone interview with Dr. Milton Magness, a psychologist in Houston, Texas, who specializes in treating clergy members who have sex addictions but are working to stay in their marriages. [Id. at 22, 24-25, 62]. Petitioner and his wife scheduled a three-day session with Dr. Magness for mid-November 2009, and shortly after that interview, in early October, Petitioner returned to Haiti "because [they] had business . . . [he] had to take care of." [Id. at 24-25]. Petitioner testified during his sentencing hearing that he did not have any further sexual contact with any of the young girls in Haiti after

3

his return, although "[t]he girls came to the gate numerous times[,] . . . still seeking . . . help." [Id. at 25].

Petitioner left Haiti in mid-November 2009 and traveled to Houston, where he and Ms. Bollinger had a three-day intensive session with Dr. Magness. [Id. at 26, 63]. During Petitioner's first individual session with Dr. Magness, he told Dr. Magness about his sexual contact with the young girls in Haiti. [Id. at 27-29]. Dr. Magness stopped him during that session and reminded Petitioner that he had earlier signed an informed consent form and that Dr. Magness would have to report any injuries to a child. [Id. at 64]. Not appearing "overly concerned," Petitioner continued disclosing his sexual contacts, including his contacts with the girls in Haiti. [Id. at 64-65]. When asked whether he had had any sexual contact with children in the United States, Petitioner "was adamant" that he had not. [Id. at 72]. Dr. Magness later testified that "at that point" he did not understand how Petitioner could "seem[] unconcerned about what was happening in another country" but be "adamant about saying that he had not done anything like that in the [United States]," ultimately concluding that "perhaps he thought he was beyond the reach of the law because . . . his behavior had taken place in another country." [Id. at 72-73]. After Petitioner completed his disclosures and made the same disclosures to Ms. Bollinger, Dr. Magness called the National Center for Missing and Exploited Children ("NCMEC"), and both Petitioner and Ms. Bollinger joined the call to ensure that the information provided to NCMEC was accurate. [Id. at 74-75, 93].

Informing Petitioner and Ms. Bollinger that he could not help them further, because he did not treat sex offenders, Dr. Magness referred Petitioner to Sante, an in-patient treatment program for sex addicts near Dallas, Texas. [Id. at 35, 63, 66, 70, 96]. Learning that Sante did not have a bed immediately available, Petitioner decided, against the strenuous advice of Dr. Magness and

the advice of the NCMEC representative, to return to Haiti.  [Id. at 77-78, 96; CR Doc. 39-1 at 12; CR Doc. 43-7 at 4).  According to Dr. Magness, because Petitioner made a point of saying that the children in Haiti had initiated all sexual contact, he was concerned that Petitioner would make himself available and "believed that he was not at fault because he didn't initiate" the sexual contact.  [CR Doc. 52 at 77-78].  Petitioner testified that he did not re-offend during his final stint in Haiti and was admitted at Sante in December 2009, where he stayed in treatment for 96 days. [Id. at 36-37; CR Doc. 39-7 at 23].  Following his release from the in-patient program at Sante, Petitioner moved back to Gastonia, where he began attending Sex Addicts Anonymous meetings, meetings he continued attending until he was arrested.  [Doc. 52 at 39, 99-100].

> **B.**    **Petitioner's Indictment and Guilty Plea.**

Petitioner was ultimately indicted by a federal grand jury and charged with two counts of traveling in foreign commerce and engaging in illicit sexual conduct with a minor, in violation of 18 U.S.C. § 2423(c) and (e).  [CR Doc. 1].  Seven months after he was charged, Petitioner filed a motion for a bill of particulars, requesting that the Government specify the identity of the victims, as well as whether Petitioner was alleged to have engaged in sexual acts as defined in 18 U.S.C. § 2246 or commercial sexual acts as defined in 18 U.S.C. § 1591.  [CR Doc. 18].

In response, the Government identified the two minors, one denominated as CV3 in investigative reports whose date of birth was May 10, 1997, and the other denominated as CV2 in investigative reports whose date of birth was February 17, 1998.  [CR Doc. 20].  The Government noted that it intended to prove that Petitioner gained access to his victims by providing them and other local children with food and clothing and engaged in sexual acts with them, as defined in 18 U.S.C. § 2246.  [Id.].

Thereafter, Petitioner moved to dismiss the indictment against him, arguing that § 2423(c) is an unconstitutional exercise of the Commerce Clause powers. [CR Doc. 22]. The Government filed a response in opposition to Petitioner's motion, arguing that Congress had the authority to enact § 2423(c) under the Foreign Commerce Clause of the United States Constitution and that, even if not authorized by the Foreign Commerce Clause, §§ 2423(c) and (f)(1) are necessary and proper to the implementation of the international treaty obligations of the United States. [CR Doc. 23]. Two days later, this Court entered a text order denying Petitioner's motion to dismiss, noting that it would ultimately issue a written order. In that order, this Court declined to decide whether § 2423(c) was authorized by the Foreign Commerce Clause but nevertheless upheld its constitutionality, holding that it was authorized by the Necessary and Proper Clause of the Constitution, consistent with the United States' alternative argument. [CR Doc. 34]. The next day, Petitioner entered a conditional guilty plea, without a plea agreement, in accordance with Federal Rule of Criminal Procedure 11(a)(2), in which he reserved his right to appeal the denial of his motion to dismiss. [CR Doc. 24].

### C. Petitioner's Sentencing.

The probation office submitted a presentence report ("PSR"), in which it calculated a preliminary Sentencing Guidelines term of life in prison, based on a total offense level of 43 (reduced from a level 44) and a criminal history category of I. [CR Doc. 32 at ¶¶ 43, 53: PSR]. The probation officer also noted, however, that Petitioner was subject to a statutory maximum of 30 years as to each offense, resulting in a total statutory maximum and Guideline term of 60 years in prison. [CR Doc. 32 at 19; see also U.S.S.G. § 5G1.1(a)].

Responding to the draft PSR, the Government objected, first, to the inclusion of paragraphs in the PSR describing sexual contact between Petitioner and victims known as CV1 and CV4 as

part of the offense-level calculation. [CR Doc. 30]. The Government explained that, although the sexual conduct engaged in by Petitioner included CV1's masturbating him and CV4's touching his penis, as well as his fondling both of the girls, his contact with these victims did not constitute "illicit sexual conduct" as defined in 18 U.S.C. § 2246 and should not be considered in calculating Petitioner's offense level. [CR Doc. 30 at 1-2]. The United States also objected to the failure of the probation officer to recommend a five-level enhancement under Sentencing Guidelines § 4B1.5(b), based on Petitioner's status as a repeat and dangerous sex offender against minors, noting that Petitioner admitted during his phone call to NCMEC that he performed oral sex on two eleven-year-old girls on at least four occasions. [CR Doc. 30 at 2].

Petitioner objected to the draft PSR as well, challenging, in addition to the inclusion of his conduct toward CV1 and CV4 in the offense-level calculations, the probation officer's use of Sentencing Guidelines § 2G1.3, rather than § 2A3.1, in calculating Petitioner's base offense level. [CR Doc. 31]. Petitioner also objected to a vulnerable-victim enhancement, calculating a total offense level of 35 and an advisory Guidelines range of imprisonment of between 168 and 210 months in prison. [Id.].

In response to these objections, the probation officer removed Petitioner's conduct toward CV1 and CV4 from the offense-level calculations but added a five-level enhancement based on Petitioner's status as a repeat and dangerous offender, consistent with the Government's objections. [CR Doc. 32 at 22]. The probation officer continued to apply § 2G1.3, noting that the commentary to that guideline includes § 2423 in its entirety. [Id. at 23].

Also, in preparation for Petitioner's sentencing hearing, the Government submitted victim-impact statements from the victims of Petitioner's offense and their family members. CV2, who was 15 years old when she wrote the letter about four years after her abuse, wrote that she feels

ashamed of herself, that "[e]verybody is pointing fingers at [her]," that she does not know what to do, and that she "keep[s] on thinking about that thing." [CR Doc. 43-3 at 4]. CV2 stated further that she "always ha[s] tears in [her] eyes" and that, "[f]or [her], [she] no longer exist[s]." [Id.].

CV3 stated in her impact statement that she is ashamed of herself every day, she is ashamed before her mother, siblings, and friends, and her future is ruined, as everyone in the area knows what happened and points fingers at her when she passes by. [CR Doc. 43-3 at 8]. CV3 stated that she cries every day and that no one can console her, stating:

> As for me, the best solution is to end my life. I don't like to talk about that because every time, I talk about it, it rips out my guts, my dreams are ruined, and it takes a toll on me. Since then, I can no longer do as well in school as I used to before, I can't even explain it to my family.

[Id.]. CV3's mother described believing that Petitioner was doing something good for her daughter, when, instead, he was abusing her. [CR Doc. 43-3 at 1]. According to CV3's mother, CV3 "has no hope in the future" and "lives in pain," does not do well in school anymore, and when CV3 and her mother walk around their neighborhood, "everybody stares at [them] and bad-mouths [them]." [Id.]. CV3's mother concludes, "[e]very time I look at her, it makes me sad, the way I see her being tormented by it." [Id.].

Like the other victims, CV4 stated that she has "great sadness" in her heart and that others in her neighborhood ridicule her, point fingers at her, talk about her, and humiliate her. [CR Doc. 43-3 at 5]. CV4 stated that, because of this reaction, she cannot walk around town and that "[e]very time [she] sit[s] down and think[s] about it, [she] ha[s] tears running in [her] eyes." [Id.]. CV4's uncle corroborated CV4's reports of humiliation, stating that the entire family is bad-mouthed and ridiculed when they go outside, that they "live really badly," and that they "are like scars on the

area." [CR Doc. 43-3 at 7]. Finally, CV1's mother reported that she and her daughter "have been living in the woods as a result" of her daughter's abuse. [CR Doc. 43-3 at 6].

This Court conducted Petitioner's sentencing hearing, during which the Court overruled Petitioner's remaining objections, CR Doc. 52 at 6-7, and calculated a total offense level of 43 and a criminal history category of I, resulting in a preliminary advisory term of life in prison, limited by the statutory maximum of 30 years as to each count of conviction, or 60 years, CR Doc. 52 at 7. During the sentencing hearing, the Court heard testimony from Petitioner and Ms. Bollinger, Dr. Magness, and Dr. William Tyson, a psychologist hired to testify about Petitioner's risk of recidivism, among others.

One of those witnesses, Marie Major, ran an orphanage near the Village of Hope in Haiti and testified that it is not unusual for impoverished young girls in that area to offer themselves sexually in exchange for food because they are poor and hungry. [CR Doc. 52 at 117-19, 129]. Dr. Tyson testified to his examination of Petitioner and his conclusions that Petitioner is not a pedophile, notwithstanding his molestation of the girls in Haiti and his admission that he was sexually aroused by children, CR Doc. 52 at 139, 143-44, 157; that Petitioner is a good candidate for treatment, particularly if it is judicially imposed; and that Petitioner's risk for recidivism is low, Id. at 150-51.

When given the opportunity to allocute, before the district court's pronouncement of sentence, Petitioner acknowledged that he "hurt a lot of girls," as well as his wife, and stated that he wanted help so badly that he "was willing to take the risk" of being punished for his conduct. [CR Doc. 52 at 168-69]. Petitioner regretted that he could not get help without "indict[ing] himself" and that he could not "have received the help that [he] needed before [his] disease progressed to the degree that it did." [CR Doc. 52 at 169-70].

Anthony G. Scheer, one of the two attorneys who represented Petitioner, then argued in favor of a 55-year variance, asking the Court to sentence Petitioner to five years in prison. [CR Doc. 52 at 172]. Although Petitioner, through counsel, acknowledged that he had "molested some girls in Haiti back in 2009," he argued that his life had primarily been one of service and requested that the Court impose a sentence that would enable Petitioner, who was 68 years old, to get out of prison before the end of his life. [Id. at 173-74]. Petitioner also noted that he voluntarily reported his offenses and that leniency in his case would encourage "every sex offender out there lurking in the shadows" to do what he had done. [Id. at 175-76]. Petitioner noted further that he had provided a detailed confession, engaged in therapy, and continued treatment through SAA. [Id.]. Petitioner argued that there was no significant risk that he would reoffend, such that there was no need for specific deterrence, and that by imposing a significant downward-variance sentence, the Court would encourage other offenders to come forward. [Id. at 177-78].

In response to Petitioner's argument that a significant downward variance would benefit children by encouraging others to stop offending and to self-report, this Court asked Petitioner what a "five-year sentence say[s] to the victims and their families in Haiti and to future victims that consider coming forward against a powerful authority figure." [CR Doc. 52 at 178]. In response, Petitioner's counsel stated that he did not think that the victims had "a strong interest" in a long sentence and that a lower sentence would not have a "palpably different" effect on them. [Id. at 178-79]. Petitioner also argued that even if there were people who would misunderstand a five-year sentence, it "would be worth it," if such a sentence caused even one offender to seek help, rather than continuing to victimize young girls out of fear of a long sentence. [CR Doc. 52 at 181].

In response to Petitioner's arguments in mitigation, the Government noted that Petitioner did not express genuine remorse for his victims and, instead, seemed more remorseful that his wife and friends in Haiti were hurt. [CR Doc. 52 at 184]. The Government noted that Petitioner acknowledged that he "sexually acted out" but never said he was sorry to the victims and did not "own[] what he did to th[ose] children." [Id.]. The Government noted further that it was recommending a 25-year sentence, which was more than a 50% reduction, and that Petitioner was asking the court to impose a 90% downward-variance sentence, a sentence the Government suggested would be "an insult to the victims." [Id. at 185]. Addressing Petitioner's argument in favor of leniency based on his having self-reported his offenses, the Government noted that Petitioner had not sought treatment in order to report his offenses and that, while Petitioner "deserve[d] some credit," he did not deserve a 90% reduction for his self-reporting. [Id. at 186].

After hearing Petitioner's evidence, as well as both parties' arguments, this Court sentenced Petitioner to 25 years in prison. [Doc. 52 at 192]. The Court stated that it had "considered the arguments for a variance set forth in the defendant's sentencing memorandum and argued for" during the sentencing hearing, "including but not limited to the arguments for a variance based upon unique factors of this case." [Id. at 188]. In particular, the Court noted that one of the most unique factors was "the out-of-the-shadows self-reporting aspect of the case," noting that the Government "candidly indicate[d] that the prosecution would have never probably happened without that self-reporting." [Id.]. The Court also noted Petitioner's efforts at treatment and self-improvement between his release from Sante and his arrest, which included his assisting others who were combating their addictions. [Id.]. The Court addressed Petitioner's age, noting that he was older than many of the defendants the Court had sentenced for similar offenses and that "[a]ny sentence imposed … takes on greater significance because of the life span issue

involved." [Doc. 52 at 189]. And, the Court acknowledged the years of pastoral work Petitioner had given to "some of the poorest of poor people," as well as the "impressive" support family and friends and community he enjoyed. [Id.].

The Court then stated, however, that all of Petitioner's positive characteristics and the positive aspects of the case had to be "balanced against the nature and circumstances of [Petitioner's] offense," noting that Petitioner's was "one of the most heinous cases" that the Court had encountered. [CR Doc. 52 at 190]. The Court noted that "[t]he abuse of trust that is involved in an aid worker taking advantage of very poor, very needy children in the way that [Petitioner] did" was an unusual factor, as well as the young age of the victims, which the Court characterized as "very troubling." [Id.]. Addressing Ms. Majors' testimony that young Haitian girls offer themselves as a way of getting food and clothing, the Court stated that "girls in Haiti need protection from molesters of children just as much as any other girls," and the Court "reject[ed] the notion proffered by [Petitioner] repeatedly … that the girls seduced him." [Id.]. The Court stated further that "the notion that 11 year old girls seduced [Petitioner], a person who learned how to live a double life with great efficiency, … is preposterous." [Id. at 191]. The Court then referenced the victim-impact statements, noting that the victims reported lacking hope in the future and reported being ridiculed, having difficulty sleeping, and living with pain and heartbreak, with one victim having considered suicide. [Id.]. The Court found that these were foreseeable consequences caused by "[t]he director of the House of Hope engaged in self-absorbed, destructive, denigrating, abusive, degrading conduct that resulted in the loss of hope, loss of trust." [Id.].

The Court then stated that it had considered the sentencing factors set forth in 18 U.S.C. § 3553(a) and found that a substantial variance was warranted if it was to do Petitioner any good,

given his age, but that a variance greater than that recommended by the Government was "not warranted by the facts of this case." [Id.]. The Court concluded that a sentence of 25 years was sufficient, but not greater than necessary, to accomplish the § 3553(a) sentence objectives, including the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment and adequate deterrence, and to protect the public from further crimes of Petitioner. [Id.].

**D.    Petitioner's Appeal and Motion to Vacate.**

Petitioner appealed his convictions and sentence, arguing that the statute that prohibits traveling in foreign commerce and engaging in illicit sexual conduct, 18 U.S.C. § 2423(c), is unconstitutional. Petitioner also argued that his sentence is procedurally and substantively unreasonable. See United States v. Bollinger, 798 F.3d 201 (4th Cir. 2015). The Fourth Circuit affirmed this Court's judgment. Id. at 222. Petitioner filed a petition for writ of certiorari. United States v. Bollinger, No. 14-4086 (4th Cir.). The Supreme Court denied the petition on May 23, 2016.

Petitioner timely filed the pending motion to vacate on May 22, 2017. [CV Doc. 1]. The Government moved to dismiss Petitioner's motion. [CV Doc. 10]. In support of the motion to dismiss, the Government submitted affidavits from Scheer [CV Doc. 10-1], as well as from Steven T. Meier [CV Doc. 10-2], who also represented Petitioner before this Court. The Petitioner responded to the Government's motion. [CV Doc. 13]. Petitioner has also made two motions to supplement and one motion to amend his motion to vacate. [CV Docs. 14, 15, 21].

**II.    STANDARD OF REVIEW**

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior

proceedings …" in order to determine whether the petitioner is entitled to any relief on the claims set forth therein.  As discussed above, after examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law.  See Raines, 423 F.2d at 529.

### III.    DISCUSSION

#### A.    Petitioner's Claims of Ineffective Assistance of Counsel.

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  See U.S. CONST. amend. VI.  To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him.  See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).  Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice."  Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008).  If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong."  United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

To establish prejudice in the context of a guilty plea, a petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would

have insisted on going to trial." Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).  In evaluating such a claim, statements made by a defendant under oath at the plea hearing carry a "strong presumption of verity" and present a "formidable barrier" to subsequent collateral attacks.  Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).  Indeed, "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should dismiss … any § 2255 motion that necessarily relies on allegations that contradict the sworn statements."  United States v. Lemaster, 403 F.3d 216, 221-22 (4th Cir. 2005).

When a defendant pleads guilty, he waives all nonjurisdictional defects in the proceedings conducted prior to entry of the plea."  United States v. Moussaoui, 591 F.3d 263, 279 (4th Cir. 2010).  Thus, a knowing and voluntary guilty plea "forecloses federal collateral review" of prior constitutional deprivations, including allegations of ineffective assistance of counsel that do not affect the voluntariness of the plea.  See Fields v. Att'y Gen. of Md., 956 F.2d 1290, 1294-96 (4th Cir. 1992); accord United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997); Wilson v. United States, 962 F.2d 996, 997 (11th Cir. 1992); Smith v. Estelle, 711 F.2d 677, 682 (5th Cir. 1983).  A guilty plea is valid when it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."  Burket v. Angelone, 208 F.3d 172, 190 (4th Cir. 2000) (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)).

In Lafler v. Cooper, 566 U.S. 156 (2012), the Supreme Court held that a criminal defendant has a right to the effective representation of counsel during the plea-bargaining stage of the prosecution and that whether this right was abridged is governed by the familiar standard described in Strickland v. Washington, 466 U.S. 668 (1984).  Lafler, 566 U.S. at 1620-63.  The parties in Lafler agreed that counsel's representation was deficient when he advised the defendant to reject

the plea offer on the grounds he could not be convicted at trial.  Id. at 163.  Applying Strickland, the Court in Lafler held that where a defendant argues that deficient advice resulted in his rejection of a favorable plea offer, he must show, in addition to the deficient advice, that (1) but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court, (2) that the court would have accepted its terms, and (3) that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.  Id. at 164.

When the ineffective assistance claim relates to a sentencing issue, the petitioner must demonstrate a "'reasonable probability' that his sentence would have been more lenient" but for counsel's error.  Royal v. Taylor, 188 F.3d 239, 249 (4th Ci1r. 1999) (quoting Strickland, 466 U.S. at 694)).  If the petitioner fails to meet this burden, the "reviewing court need not even consider the performance prong."  United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

### 1. Petitioner's claim related to counsel's pre-plea advice about the maximum penalties Petitioner faced if convicted without a plea agreement.

Petitioner first argues that his trial counsel provided constitutionally deficient representation by failing to advise him of the role that the United States Sentencing Guidelines would play "in computing his sentence" and by failing to "calculate[] an approximately accurate Guideline offense level and the resulting advisory sentencing range."  [CV Doc. 1-2 at 6]. Petitioner asserts that had he been accurately advised of "the looming certainty of an advisory Guideline sentence of life without parole and the strong possibility of a sixty[-]year sentence," he would have urged his lawyers to pursue a written plea agreement that significantly reduced his sentencing exposure.  Petitioner states in an affidavit that until his PSR was prepared, he had "no idea" that his advisory Guidelines term would be life in prison.  [CV Doc. 1-3 at 2].  Petitioner

also asserts that Scheer admitted that "he 'never saw that coming'" and that Meier advised him that because of his record of community service and lack of criminal history, he likely faced a sentence of "far less" than 30 years.  [Id.].  Finally, Petitioner asserts that while he knew that both of the counts he pleaded guilty to carried a maximum penalty of 30 years in prison, he did not know that pleading guilty to both counts could result in a sentence of 60 years in prison and that if he had known about the "strong possibility of a sixty[-]year sentence," "he would have urged his lawyers to pursue a written plea agreement that significantly reduced his potential sentencing exposure."  [CV Doc. 1-2 at 8; CV Doc. 1-3 at 2].

Petitioner's allegations are not sufficient to support a claim of constitutionally deficient representation or the prejudice necessary under Strickland.  Scheer states in his affidavit that he believed that Petitioner had a "creditable argument" that Sentencing Guidelines § 2A3.1 would govern Petitioner's advisory Guidelines range.  [CV Doc. 10-1 at ¶ 7].  This assertion is consistent with Petitioner's objections to the PSR in which Petitioner asserted that his total offense level was 35 and that the advisory Sentencing Guidelines range of imprisonment was 168-210 months.  [CR Doc. 31 at 4].  This assertion is also consistent with an email attached to Meier's affidavit in which Petitioner tells an acquaintance in Haiti that the Government had offered to "settle [his] case out of court without having a trial" but he would face "somewhere between 12 and 20 years" in prison.  [CV Doc. 10-2 at 14].

Neither the motion to vacate nor Petitioner's affidavit contradict Scheer's assertion that Scheer believed the proper Guidelines calculation yielded an advisory range well below life in prison, and Petitioner has not alleged facts sufficient to support his assertion that his trial counsel provided constitutionally deficient pre-plea representation based on their predictions about the sentence Petitioner might receive.  As the Supreme Court has stated, "uncertainty is inherent in

predicting court decisions." <u>McMann v. Richardson</u>, 397 U.S. 759, 771 (1970). Accordingly, an erroneous prediction by counsel of what a court will do or what sentence a defendant is likely to serve does not establish constitutionally ineffective assistance. <u>See</u> <u>Spiller v. United States</u>, 855 F.3d 751, 757 (7th Cir. 2017); <u>Moreno-Espada v. United States</u>, 666 F.3d 60, 65 (1st Cir. 2012); <u>United States v. Washington</u>, 619 F.3d 1252, 1258-59 (10th Cir. 2010); <u>cf.</u> <u>Little v. Allsbrook</u>, 731 F.2d 238, 240 (4th Cir. 1984) (holding that an attorney's "grossly misinform[ing]" a defendant "about parole possibilities" did not establish constitutionally ineffective assistance of counsel requiring the district court to permit him to withdraw his guilty plea).

Additionally, Petitioner asserts that he should have been "accurately apprised of the looming certainty of an advisory sentence of life without parole and the strong possibility of a sixty[-]year sentence." Petitioner, however, never faced an advisory Guidelines term of life without parole, because the applicable statutory maximum terms of imprisonment for the two counts he faced capped the advisory Guidelines term at 60 years. <u>See</u> 18 U.S.C. § 2423(c); U.S.S.G. § 5G1.1(a). Furthermore, there is no evidence that Petitioner ever faced "the strong possibility of a sixty-year sentence." Both the Government and Petitioner sought a downward-variance sentence for Petitioner, who was 68 years old when he was sentenced. This Court granted that request, sentencing Petitioner to 25 years in prison, well below the 60-year sentence that he asserts there was a "strong possibility" he would receive. Petitioner has not shown that the information he received from Meier and Scheer about the sentence he might receive was false or alleged anything more than a possible misjudgment about how this Court might rule on disputed guideline issues. Petitioner, therefore, has not established that either Meier or Scheer provided constitutionally deficient representation based on their pre-plea sentence predictions or advice. This claim, therefore, fails.

Petitioner has also failed to establish prejudice based on the advice he received about the potential sentence he would face. Petitioner asserts that had he known that he faced a Guidelines sentence of life without parole and the strong possibility of a 60-year sentence, "he would have urged his lawyers to pursue a written plea agreement that significantly reduced his potential sentencing exposure." [CV Doc. at 1-2 at 8]. Petitioner also asserts that his trial attorneys should have "sought from the Government a plea agreement that called for the dismissal of one count of the Indictment." [Id. at 9]. This assertion that his trial attorneys should have sought a plea to a single count fails the prejudice prong of Strickland's ineffective-assistance-of-counsel standard; it is speculative and does not establish a reasonable probability of a different result. Petitioner does not assert, for example, that had his trial attorneys negotiated such a plea, he would have accepted it. Additionally, both Scheer and Meier state in their affidavits that the Government offered Petitioner the opportunity to plead guilty to one of the two counts against him, in exchange for the Government's agreement to dismiss the other count, and that Petitioner rejected that offer. [See CV Doc. 10-1 at ¶¶ 5, 6, 8; CV Doc. 10-1 at 5-11; CV Doc. 10-2 at ¶¶ 4, 5; CV Doc. 10-2 at 4].

In sum, this first claim of ineffective assistance of counsel is without merit.

## 2. Petitioner's claim that counsel was ineffective for failure to convey plea offer.

Petitioner next argues that Meier "failed to convey" a plea offer from the Government that would have resulted in a sentence of eight years and that, had he been aware that he faced a Guidelines term of life without parole and a statutory maximum term of 60 years in prison if convicted of both of the charged offenses, he "would have accepted the eight[-]year offer." [CV Doc. 1-2 at 11]. Petitioner asserts in an affidavit submitted in support of Petitioner's motion to vacate that Meier informed Petitioner that Meier had received a plea offer for 8 years' imprisonment, but that Meier had already turned it down on Petitioner's behalf. [CV Doc. 1-3 at

2]. Petitioner asserts further that when he learned of the plea offer, he "did not fully understand the consequences" of Meier's action in rejecting the offer. [Id.].

Both Meier and Scheer state in their affidavits that Petitioner was unwilling to accept any plea offer that would result in significant jail time, because Petitioner's age and medical condition would mean that even a five-year sentence was effectively a life sentence. [CV Doc. 10-2 at ¶ 3: CV Doc. 10-1 at ¶ 9]. Even if Petitioner's assertions are accepted as true, as they must be when resolving a motion to vacate without an evidentiary hearing, he fails to allege constitutionally deficient representation.

First, Petitioner's statement that he would have accepted the offer had he understood the maximum sentence he could receive for the two charged offenses evidences his understanding that, even at the time he learned of the alleged offer, he understood that he could still accept the offer. Petitioner offers no evidence that the Government's offer had lapsed by the time he learned of it from Meier or that Meier's initial rejection of that offer was not reversible had Petitioner asked Meier to revive the offer. To the contrary, Petitioner's allegations suggest the opposite.

Second, Petitioner asserts that had he been properly advised that the advisory Guideline sentence would be life, he would have accepted the offer, but at the time the offer was extended, the parties were not certain what guideline this Court would apply in calculating Petitioner's advisory Guidelines range. And, as noted above, Petitioner's first condition precedent to accepting the plea—his understanding that he faced an advisory Guidelines term of life in prison—would never have been satisfied because the Guidelines did not advise a sentence of life without parole, no matter what guideline was applied. Petitioner also suggests that had he understood that he faced a sentence of 60 years in prison, he would have accepted the plea. Petitioner, however, was advised of the charges against him and that each offense carried a sentence of 30 years at his initial

appearance in this matter. Petitioner does not assert that Meier advised him that his sentences would run concurrently.

Petitioner alleges that Meier did not convey a plea offer before Meier rejected the offer on Petitioner's behalf, but Petitioner also makes clear that he understood that he nevertheless could have accepted the offer and would have accepted the offer but for Meier's failure to advise Petitioner of the sentencing consequences of his decision to reject the Government's offer. Petitioner's claim of prejudice, therefore, depends on his claim of deficient sentencing advice. Petitioner's allegations, however, do not support his assertion that Meier gave him wrong or bad advice about his sentencing exposure. Because the prejudice Petitioner asserts depends on constitutionally deficient advice and Petitioner has not alleged facts from which this Court could conclude that he received constitutionally deficient advice from Meier, Petitioner cannot show a reasonable probability that he would have accepted the alleged plea offer, even if he had learned about it earlier, and received a lower sentence as a result. See Frye, 566 U.S. at 150 (a defendant must show "a reasonable probability [he] would have accepted the prosecutor's original offer of a plea offer if the offer had been communicated to him").

In sum, this second claim of ineffective assistance of counsel is also without merit.

### 3. Petitioner's claim that counsel was ineffective for failing to challenge venue.

Petitioner next asserts that his trial counsel improperly failed to challenge this Court's jurisdiction to adjudicate the case against him because venue did not properly lie in the Western District of North Carolina. This argument is meritless.

As a defendant in a criminal trial, Petitioner had a constitutional right to be tried in the district where his crime was committed or where Congress has provided venue. U.S. Const. art. III, § 2. Section 3237(b) of Title 18 of the United States Code provides that where an offense

involves the transportation in foreign commerce, it is a continuing offense and "may be …

prosecuted in any district from, through, or into which … person moves."  The statute

Petitioner was charged with violating, 18 U.S.C. § 2423(c), provides that "[a]ny United States

citizen or alien admitted for permanent residence who travels in foreign commerce, and engages

in any illicit sexual conduct with another person shall be … imprisoned not more than 30 years

…." 18 U.S.C. § 2423(c).  This offense has three elements: American citizenship; travel in foreign

commerce; and illicit sexual conduct.  United States v. Pendleton, 658 F.3d 299, 304 (3d Cir.

2011).

Under § 3237(b), venue was proper in the Western District of North Carolina because, as

Ms. Bollinger testified during Petitioner's sentencing hearing, Petitioner and his wife lived in this

district before they traveled to Haiti to work in the Village of Hope, and they traveled back and

forth between Gastonia and Haiti during the years that Petitioner worked at the Village of Hope.

[CV Doc. 52 at 161-62].  Petitioner traveled in foreign commerce from this district to Haiti, where

he committed his offenses against his victims, and venue was, therefore, proper in this district

under Section 3237(b).

Even if venue in this district were not proper under Section 3237(b), it would be proper

under 18 U.S.C. § 3238, which provides that venue is proper in the district where a defendant is

arrested or "first brought," where the offense was begun or committed outside of the jurisdiction

of any particular state or district.  The Fourth Circuit held in United States v. Levy Auto Parts that

venue in the district of arrest was proper, even though the charged conspiracy "was essentially

foreign."  787 F.2d 946, 952 (4th Cir. 1986).  And the Third Circuit held in Pendleton that venue

for a prosecution under Section 2423(c) was proper in the district of arrest, even though the

defendant's offense began in New York but was "essentially foreign" because the illicit sex act

occurred in Germany. Pendleton, 658 F.3d at 305. The Pendleton court noted that the Fourth Circuit's decision in Levy Auto Parts explicitly rejected the argument relied on by the district court in United States v. Perlitz, 729 F. Supp. 2d 46 (D. Conn. 2010), the case on which Petitioner relies. Because Petitioner was arrested in the Western District of North Carolina, venue was proper in this district under Section 3238.

Under either Section 3237(a) or Section 3238, Petitioner was properly prosecuted in this district. Petitioner has not shown, therefore, either deficient representation or prejudice based on his trial attorney's failure to challenge venue.

### 4. Sentencing advocacy.

Notwithstanding the significant downward-variance sentence he received, Petitioner next argues that his trial counsel improperly "failed to present a comprehensive, all-inclusive argument in mitigation." [CV Doc. 1-2 at 19]. Petitioner complains that his trial counsel failed to obtain statements from the victims addressing their feelings about the punishment Petitioner should receive and failed to argue that his 25-year sentence would create unwarranted sentence disparities among defendants with similar records, see 18 U.S.C. § 3553(a)(6).

With respect to the victim-impact statements and trial counsel's failure to obtain statements from the victims in mitigation, Scheer explains in his affidavit that he tried but was unable to obtain those letters in time for Petitioner's sentencing hearing. [CV Doc. 10-1 at ¶¶ 16-18]. Scheer states that he traveled to Haiti in October of 2012 and again in November of 2013, the latter visit explicitly for the purpose of trying to obtain statements from Petitioner's victims because Scheer had "heard" that the victims felt compassion for Petitioner. [Id. at ¶¶ 17-18]. Scheer states that he attempted for three days to meet with the victims but was unable to get any of the victims to provide a statement. [Id. at ¶ 18]. In September 2015, more than 18 months after Petitioner was

sentenced, Scheer traveled for a third time to Haiti because he had heard that the victims were "surprised and/or dismayed at the sentence [Petitioner] received" and he sought to learn why the victims had written the statements submitted by the Government and considered by this Court during Petitioner's sentencing hearing. [Id. at ¶ 20]. Scheer states that the letters Petitioner now asserts should have been obtained before his sentencing hearing were sent to Scheer after this third trip to Haiti. [Id.].

Petitioner has not established that his trial counsel failed to make reasonable efforts to obtain the more favorable victim statements before his sentencing hearing. Scheer makes clear that he visited Haiti in an effort to obtain favorable statements from the victims just two months before Petitioner was sentenced and stayed there for three days, trying, without success, to obtain helpful statements from Petitioner's victims. And Petitioner does not contradict Scheer's statements that he tried to obtain helpful victim statements in time to assist Petitioner's case in mitigation but was unable to convince any of the victims to give him those statements at that time. Far from deficient representation, the record establishes that Scheer provided Petitioner with vigorous representation in preparation for Petitioner's sentencing hearing in his efforts to provide this Court with victim statements in mitigation.

With respect to the unwarranted-sentence-disparities argument, Petitioner's argument fails because he cannot show a reasonable probability that this Court would have sentenced him to a term below 25 years in prison, even if his trial counsel had argued that his sentence would create unwarranted sentence disparities. Furthermore, due to Petitioner's age and pre-indictment cooperation, Scheer and Meier could reasonably conclude that the most persuasive arguments in mitigation would be the arguments Scheer presented in favor of leniency. Petitioner has not overcome the presumption that his trial attorneys' strategic decision to focus on the arguments

they believed to be the arguments most likely to result in a significant downward-variance sentence—which they achieved for Petitioner—was reasonable and falls well within the range of constitutionally adequate representation.  See United States v. Rangel, 781 F.3d 736, 742 (4th Cir. 2015) ("There is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' and 'that, under the circumstances, the challenged action might be considered sound trial strategy.'" (quoting United States v. Higgs, 663 F.3d 726, 739 (4th Cir. 2011))).  Having shown neither deficient representation nor prejudice, Petitioner's claim that his attorneys failed to provide adequate representation in seeking leniency on Petitioner's behalf fails.

### 5. Double jeopardy.

Petitioner argues, finally, that Meier and Scheer improperly failed to challenge certain guideline enhancements as a violation of the double-jeopardy clause of the Fifth Amendment.  In particular, Petitioner asserts that two offense-level enhancements violated the Double Jeopardy Clause: (1) the two-level enhancement under Sentencing Guidelines § 2G1.3(b)(4)(A), which this Court applied because the offense involved the commission of a sex act or sexual contact and (2) the five-level enhancement under § 4B1.5(b)(1), which this Court applied because the offense is a covered sex crime, the career-offender guideline did not apply, and Petitioner engaged in a pattern of activity involving prohibited sexual conduct.

This claim of ineffective assistance of counsel fails because each of these enhancements punishes a different offense characteristic.  Namely, the base offense level applies to a number of criminal offenses, including the offense Petitioner committed, but also to the transportation of adults in interstate or foreign commerce for the purpose of prostitution, the coercion or enticement of an adult or child to travel in interstate or foreign commerce for the purpose of prostitution, or

the facilitation of travel in interstate or foreign commerce of another person knowing that the person is traveling for the purpose of engaging in illicit sexual contact. <u>See</u> 18 U.S.C. §§ 2421, 2422, 2423(e); U.S.S.G. app. A. Not all these offenses require the commission of a sex act or sexual contact. Therefore, the enhancement based on Petitioner's offenses' having involved sexual contact did not violate double jeopardy. Similarly, the enhancement under § 4B1.5(b)(1) requires a pattern of activity involving prohibited sexual conduct. Neither the base offense level nor the two-level enhancement under § 2G1.3(b)(4)(A) requires a pattern of prohibited sexual conduct. The base offense level and each of these enhancements, therefore, punish different offense characteristics, and their application did not violate double jeopardy.

Because Petitioner has not shown constitutionally deficient representation based on his trial attorneys' failure to challenge the guideline calculation based on double jeopardy, the Court will deny Petitioner's claim of ineffective assistance of counsel on this ground.

**B.** **Petitioner's Motions to Amend and to Supplement.**

**1.** **Motions to supplement.**

Under Rule 15(d), the Court "may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).

**a.** **First motion to supplement.**

In his first motion to amend, Petitioner seeks to supplement his motion to vacate with a copy of an email between Petitioner's trial counsel, Anthony Scheer, and Jean R. Achille, an associate of Petitioner's from Haiti. [CV Doc. 14]. Scheer wrote the email on September 18, 2015, approximately nine months after this Court sentenced Petitioner to 25 years in prison. [<u>Id.</u> at 8]. In the email, Scheer reminds Achilles of Scheer's trip to Haiti in October 2013, which was

for the purpose of obtaining helpful statements from Petitioner's victims before Petitioner's sentencing hearing. In the email to Achilles, Scheer notes that during the October 2013 visit to Haiti "the families were not cooperative anymore." He also states that this was the visit during which the "'man from the embassy' meeting took place," which appears from the remaining context of Petitioner's proposed supplement to refer to the involvement of a mysterious and unidentified man who "followed [the victims' families] to the Oct. 2013 meeting." [Id.]. Scheer opines in the email that the letters that were submitted on behalf of the victims during Petitioner's sentencing hearing were not true, because the girls "were not suicidal and devastated in the ways described in the letters" and "their families were okay with lighter punishment." [Id.]. Scheer speculates that "someone . . . either influenced them to exaggerate/lie in the letter, or possibl[y] wrote the letters for them." [Id.]. Scheer explains that his goal "is to find out if the words and sentiments expressed in those letters was true." [Id.]. (emphasis in original).

The Court will allow Petitioner's motion to supplement his motion to vacate with this email. The email, however, does not change the Court's determination on Plaintiff's claims of ineffective assistance based on sentencing advocacy in this case. The email does not tend to show either deficient representation by Scheer or prejudice. To the contrary, the email corroborates Scheer's statement in his affidavit that he made a significant effort to obtain favorable victim-impact statements before Petitioner's sentencing hearing but was unable to do so. [CV Doc. 10-1 at ¶ 18]. Scheer speculates in the email that the victims may have been pressured to provide more harmful statements than they otherwise would have, but he had no evidence to offer the Court, beyond that speculation, to support his suspicion that the letters did not accurately reflect the girls' feelings.

Petitioner has presented no evidence that Scheer could have found or presented to this Court to impugn the victims' statements. This new evidence Petitioner presents does not show either that Scheer provided deficient representation or that there is a reasonable probability that Petitioner would have received a lower sentence had Scheer performed his duties differently.

**b.     Second motion to supplement**.

On August 28, 2018, Petitioner filed a second motion to supplement his motion to vacate with a letter he received through prison mail on August 23, 2018, purportedly from one of his victims in which the victim makes potentially exculpatory statements.[2] [CV Docs. 15-3, 15-4]. The letter appears to be written in the victim's native Haitian language, perhaps French or Haitian Creole. [See Doc. 15-3]. Following the letter in Petitioner's submission to the Court is what appears to be a non-authenticated translation of the letter with no indication of who translated the letter. [Id.].

The Court will grant Petitioner's motion to supplement the record in his § 2255 proceedings and consider the letter and its putative translation consistent with the aforementioned description. The letter, however, does not relate to any grounds for relief sought by Petitioner. In his motion to supplement, Petitioner refers to his counsel's deficiency "in filing [*sic*] to obtain supportive letters from victims of Petitioner's crimes" and that the letter "sheds additional light on the circumstances surrounding Petitioner's crimes and the aftermath." [CV Doc. 15 at 1-2]. Petitioner's attempt to tie this letter to his claim for ineffective assistance of counsel is ineffectual. The Court has addressed Petitioner's counsel's efforts in sentencing advocacy and this letter, to the extent it is what it purports to be, does nothing to negate those efforts.

---

[2] This motion, the letter, and its translation were filed by Petitioner under seal. Because the letter is filed under seal to protect the confidentiality of the victim and a more specific description of the contents of the letter are not necessary to ruling on Petitioner's motion to supplement, the Court does not more specifically describe the victim's statements. [See Doc. 15 and Exhibits].

Further, Petitioner has never claimed that he did not have illicit sexual relations with this victim. In fact, the email that was the subject of Petitioner's first motion to supplement by Scheer to Petitioner's associate, Jean Achille, states that it is "accepted by the Government and us" that Petitioner had "sexual encounters" with this victim when she was "about 11 years old." [Doc. 14 at 7]. Also, this letter at least partially contradicts a previous letter written by this victim to the Court. [See Doc. 1-3 at 11-13]. As such, while the Petitioner's motion to supplement his motion to vacate with this letter is granted, the letter is not relevant to Plaintiff's claims for relief. Even if it were relevant, its only meaningful affect is to call Petitioner's veracity into question.

### 2. Motion to amend.

Petitioner also seeks to amend his motion to vacate. Whether a defendant may amend his Section 2255 pleading is governed by Federal Rule of Civil Procedure 15. See United States v. Pittman, 209 F.3d 314, 317 (4th Cir. 2000). Rule 15(a) provides that a party may amend its pleading once as a matter of course within 21 days or within 21 days after service of a responsive pleading. Fed. R. Civ. P. 15(a)(1). After 21 days, a party may amend its pleading only with the opposing party's written consent or the court's leave, which should be freely given when "justice so requires." Fed. R. Civ. P. 15(a)(2). "A district court may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." Equal Rights Center v. Niles Bolton Assoc., 602 F.3d 597, 604 (4th Cir. 2010).

The Court first addresses the timeliness of Petitioner's motion to amend. The Government filed its response to Petitioner's motion to vacate on November 15, 2017. [CV Doc. 10]. Petitioner did not file his motion to amend until June 25, 2019, over two years after the Government's

responsive pleading.  [Doc. 21].  Because Petitioner's motion to amend is untimely under Rule 15(a)(1), the Court must determine whether it should allow amendment under Rule 15(a)(2).

Petitioner seeks to amend his motion to vacate to allege an additional ground for ineffective assistance of counsel.  Petitioner argues that a Ninth Circuit case, United States v. Pepe, 895 F.3d 679 (9th Cir. 2018), makes his conviction unlawful.  In Pepe, the Ninth Circuit held that the version of 18 U.S.C. § 2423(c) in effect at the time of Petitioner's conduct was "inapplicable to U.S. citizens living abroad unless they were traveling—meaning something more than being in transit— when they had illicit sex."  Pepe, 895 F.3d at 682.  Petitioner argues that he was not "traveling" in Haiti within the meaning of § 2423, but rather, he was "residing" there and, therefore, was not within the scope of the statute as it existed in 2009.  Petitioner argues that the Court should allow the Petitioner to "amend" his pending Section 2255 motion with this new legal theory because it "'relates back' to the ineffective assistance of counsel claim regarding jurisdiction that Petitioner raised in his original pleading."  [CV Doc. 21 at 2].

Section 2255 provides, generally, for a one-year statute of limitations from the date on which a petitioner's judgment becomes final.[3]  28 U.S.C. § 2255(f)(1).  The one-year limitations period under 28 U.S.C. § 2255(f)(1) also applies to any supplemental claims raised after an original Section 2255 motion is filed.  Farris v. United States, 333 F.3d 1211, 1215 (11th Cir. 2003).  Under

---

[3] A petitioner may also file a Section 2255 petition within one year of when the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, when a right is newly recognized by the U.S. Supreme Court and made retroactively applicable to cases on collateral review, or the petitioner discovered facts supporting the claim that could not have been discovered earlier with due diligence.  See 28 U.S.C. §§ 2255(f)(2), (f)(3), and (f)(4).  Because none of the latter situations applies in this case, the one-year limitations period began on the date Petitioner's judgment of conviction became final, which in this case occurred when the Supreme Court denied certiorari on May 23, 2016.

Rule 15(c) of the Federal Rules of Civil Procedure, supplemental claims that relate back to the claims in the original, timely motion may be filed after the limitations period has expired. Id. A supplemental claim raised after the limitations period has expired relates back if it arises from the same set of operative facts as the claims in the original motion. Id.; see Mayle v. Felix, 545 U.S. 644, 659 (2005) ("[R]elation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims."); see also United States v. Pittman, 209 F.3d 314, 318 (4th Cir. 2000) (concluding that additional ineffective assistance of counsel claims in an untimely motion to amend did not relate back to the claims in the timely filed petition because the new claims arose from separate occurrences of "both time and type"). "[T]o relate back, an untimely claim must have more in common with the timely filed claim than the mere fact that they arose out of the same trial or sentencing proceeding." Farris, 333 F.3d at 1215. "[N]ew claims alleging different trial errors [are] not part of the same course of conduct, and, as such, [do] not relate back to the date of the . . . timely filed § 2255 motion." Id.

Here, the new claim Petitioner seeks to assert was filed well after the expiration of the one-year statute of limitations and does not relate back to his original pleading. While Petitioner presents several claims of ineffective assistance, see supra, none of those claims arise out of counsel's failure to challenge the scope of § 2423(c). Petitioner argues that his new claim "'relates back' to the ineffective assistance of counsel claim regarding jurisdiction that Petitioner raised in his original pleading." [CV Doc. 21 at 2]. It does not. Counsel's decision not to challenge venue does not arise from the same conduct as a failure to challenge the scope of the statute of conviction. See Turner v. United States, 699 F.3d 578, 585 (1st Cir. 2012) (explaining that the requirement that a claim relate back to the original pleading "cannot be satisfied 'merely by raising some type

of ineffective assistance in the original petition, and then amending the petition to assert another ineffective assistance claim based upon entirely distinct type of attorney misfeasance").

As such, because Petitioner's motion to amend is untimely and does not relate back to his original motion, the Court will deny Petitioner's third motion to amend.

## IV.     CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's § 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1.      Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1] is **DENIED** and **DISMISSED**.  To this extent, the Government's Motion to Dismiss [Doc. 10] is **GRANTED**.

2.      Petitioner's Pro se Status Report and Motion for Extension of Time to File Response/Reply [Doc. 11] is **DENIED** as moot.

3.      Petitioner's motions to supplement his Section 2255 Motion to Vacate [Docs. 14, 15] are **GRANTED**.

4.      Petitioner's motion to amend his Section 2255 Motion to Vacate [Doc. 21] is **DENIED**.

5.      **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive

procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: October 8, 2019

Robert J. Conrad, Jr.
United States District Judge